UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| DANIEL GOLODNER,<br>SECURITY TECHNOLOGY SYSTEMS,<br>LLC,<br>    Plaintiffs,<br><br>    v.<br><br>CITY OF NEW LONDON,<br>MARTIN BERLINER,<br>ROBERT MYERS,<br>    Defendants. | No. 3:10-cv-00654 (JAM) |

## MEMORANDUM OF DECISION

Plaintiff Daniel Golodner is the majority owner of co-plaintiff Security Technology Systems, LLC (STS), a security alarm company. For about seven years from 2002 to 2009, plaintiffs provided services for the City of New London, Connecticut, involving the installation, maintenance, and monitoring of alarms at city-owned buildings. In 2009, however, the City initiated a competitive bidding process to select a vendor for the services that had been furnished by plaintiffs, and the City ended up awarding a contract for these services to another company.

Plaintiffs have filed this lawsuit under 42 U.S.C. § 1983 alleging retaliation in violation of the First Amendment. They claim that they lost the City's business because defendants—the City as well as its former city manager (Martin Berliner) and director of public works (Robert Myers)—intended to retaliate against plaintiff Golodner for having previously filed a lawsuit that complained about police practices in the City of New London. Following a bench trial and consideration of all the evidence, I conclude that plaintiffs have not proved that they lost the City's business because of retaliation in violation of the First Amendment.

**FINDINGS OF FACTS**

The Court heard trial testimony over a period of two days on January 11 and 12, 2016, from the following individuals:

- Daniel Golodner, plaintiff (former alarm services provider for the City)
- Martin Berliner, defendant (former City Manager for the City of New London)
- Robert Myers, defendant (former Director of Public Works for the City of New London)
- Janita Hamel (representative from the Connecticut Department of Consumer Protection)
- Timothy Ackert (co-owner with Daniel Golodner of co-plaintiff STS, LLC)

Based on the testimony, documentary exhibits, and stipulated facts, I make the following findings of fact.

Plaintiff Daniel Golodner is 53-year-old Connecticut electrician who learned his trade while serving in the United States Navy. After serving in the Navy, Golodner went into the electrician business and acquired a L-6 low-voltage alarm journeyperson license. In 2001, Golodner formed a company—co-plaintiff STS—by means of a purchase of the assets and business of a predecessor electrical-services company. During the relevant times in this case, Golodner owned 95% of STS, and he had a business partner—Timothy Ackert, another electrician with a more advanced electrician license than plaintiff—who owned the remaining 5% of STS. Golodner was managing member of STS, and he conducted the vast majority of the company's day-to-day operations.

According to Golodner, when he purchased the business from the predecessor company, one of the predecessor's active accounts involved the servicing of alarm systems at various buildings owned by the City of New London. Golodner soon learned, however, that the City was planning to give the service contract to another company, and he complained and insisted that the City have a bidding process. STS then won the bidding process and eventually entered into a three-year written contract with the City from 2002 to 2005 for the upgrade, monitoring, and

2

maintenance of security alarms at several City buildings. *See* Def. Exh. C (contract); Doc. #68 at 15 (stipulation of facts). Under the terms of this contract and subsequent riders for additional services, STS provided 24-hour monitoring and maintenance of ten different alarm systems and three fire alarm systems at a cost to the City of $4,752 per year. Doc. #68 at 16 (stipulation).

The written contract between STS and the City expired in April 2005. According to Golodner, he wanted to renew the written contract, but the official who was formerly the Director of Public Works put him off and assured him that STS was "our company" and that "we don't need a new contract." Doc. #68 at 17 (stipulation). Consequently, STS continued after April 2005 to perform and bill the City for its alarm-related services but without a formal written contract. During the entire time that STS performed work for the City, there were no complaints about the quality or pricing of its services.

On August 29, 2008, Golodner filed a federal civil rights lawsuit against the City of New London and several New London police officers. Pl. Exh. 1. He alleged in the lawsuit that he was a long-time resident of the City of New London and that he had in the past complained about police misconduct. He further alleged that the police had ignored his complaints about his neighbors and that the police in turn had harassed and falsely arrested him in 2006 and 2007 following disputes he had with his neighbors.[1] This police-related lawsuit had nothing to do with STS or the services it provided the City.

Defendant Martin Berliner began service as the City Manager for New London in August 2006 and served in that position until the end of 2010. Doc. #68 at 15. According to trial testimony and the parties' stipulation, Berliner learned about Golodner's police-related lawsuit from the City Attorney at a City Council meeting that took place on or about October 3, 2008.

---

[1] Golodner's lawsuit was eventually dismissed on summary judgment. Because the issue at the trial before me was whether defendants retaliated against Golodner merely for the filing of this lawsuit, the ultimate merits or disposition of Golodner's claims against the police are not relevant to my consideration in this case.

Berliner himself was not named as a defendant in Golodner's police-related lawsuit. Golodner thereafter tried to meet with Berliner to discuss the lawsuit, but Berliner declined to meet with him upon the advice of the City Attorney.[2] Although more is not known about any conversations between Berliner and the City Attorney, there was no testimony at trial to suggest that Berliner had other dealings with or animus against Golodner, that Berliner was aware that Golodner's company performed alarm services for the City, or that he was upset by or complained to anyone about Golodner's filing of the lawsuit and accusations against the police department.

At some point in mid-summer of 2009—nearly a year after Golodner had filed his police lawsuit against the City—Berliner was advised by the City's new Finance Director that the City was doing business with several vendors for which there were expired contracts or no written contracts in place. This included not only a contract for the alarm-related services performed by STS, but also contracts for banking services, pension services, and the municipal garage. Both the Finance Director and Berliner thought that it was sound practice to have contracts in place with the vendors for all these services.

Because the alarm-related services furnished by STS were within the purview of the City's Department of Public Works, Berliner raised the issue about an alarm services contract with defendant Richard Myers, who had recently begun to work for the City as the Director of Public Works. Myers had never previously dealt with Golodner or, so far as the trial testimony showed, had any involvement with the alarm-related services performed by STS. By this point in time, the prior Director of Public Works who had declined Golodner's requests in 2005 to extend the prior written contract was no longer working for the City.

---

[2] The evidence was less than clear or convincing about when Golodner tried to meet with Berliner, and it is not clear whether this effort by Golodner to meet with Berliner occurred prior to the eventual bidding process for the alarm services contract in the summer of 2009.

4

Both Berliner and Myers credibly testified consistently with each other at trial about how Berliner had raised the issue with Myers of formalizing a contract for the alarm monitoring services and doing so by means of soliciting bids. Both Berliner and Myers denied that they spoke about Golodner's lawsuit against the City that had been filed nearly a year earlier. Myers denied knowing anything about Golodner's lawsuit at any time prior to initiating the new contract and bid process.

Following his conversation with Berliner, Myers set about to obtain bids. He was not required by the City regulations to follow a formal bidding process, and he—or someone else within his department—ended up soliciting written proposals from three companies—Integrated Security Systems (ISS), A.S.P. Security Systems (ASP), and ADT Security Services (ADT)—as well as from STS.

According to the documents in evidence, the City received a proposal from ISS on July 16, 2009. *See* Def. Exh. M. It received a proposal from ASP on July 27, 2009. Def. Exh. N. And it received a bid from ADT on August 4, 2015. Ex. O.

Myers also contacted and spoke by telephone with Golodner. The parties have stipulated that this contact between Myers and Golodner occurred in "late July/early August." Doc. #68 at 18. Myers told Golodner that "the City was evaluating vendors for alarm monitoring and maintenance for 2010 – 2011 and asked him to provide in writing the services he was currently providing, the annual fee for those services, and a quote for the 2010 – 2011 contract." *Ibid.*

Golodner responded by letter dated August 5, 2009, describing the services that STS furnished for the City. Pl. Exh. #4 at 1. Near the end of Golodner's letter he raised a concern that the contract was now being put out for bid for improper reasons related to "ongoing legal matters and grievances between myself and my Company against the City of New London." *Id.* at 4. The

Case 3:10-cv-00654-JAM Document 107 Filed 01/25/16 Page 6 of 11

letter was not more specific about the nature of any "ongoing legal matters" between plaintiffs and the City. Golodner sent a follow-up letter on August 11 stating that the annual fee for STS's services was $4,608. *Id.* at 5.

Myers prepared a spreadsheet with side-by-side comparisons of the information he had received about each of the four potential candidates for the alarm services contract. Def. Exh. P. The spreadsheet included a lump sum annual alarm monitoring fee from every company: ISS ($1,760), ADT (3,360), ASP ($1,728), and STS ($4,608).[3] There was also a maintenance rate per hour calculation: ISS ($65), ADT (notation "waiting from salesman 2nd request"), ASP ($72), STS (spreadsheet row left blank).[4] There was another row on the spreadsheet for the cost of new equipment, insofar as some of the companies—but not STS—told Myers that the current equipment was obsolete and that they would need to replace it if they were to perform the alarm services contract. The spreadsheet listed the one-time cost of new equipment for ISS ($3,400), for ADT (notation "waiting from salesman 2nd request"), for ASP ($7,452), and for STS (row left blank).

Myers also made notes on the spreadsheet. He noted that ISS had a staff of ten electricians, all with higher level E or C licenses, while STS was a "[o]ne man business. Does not have E or C; L license alarm install only. Subs out E/C." *Id*.

Myers submitted his spreadsheet to Berliner, and he recommended that the City select ISS for the alarm services contract on the ground that ISS was the lowest bidder.[5] Def. Exh. P.

---

[3] Golodner's letter to the City of August 11 stated that STS's "annual fee" was $4,608, billed semiannually. Pl. Exh. 4 at 5. At trial, Golodner testified that what this meant was he would bill the City $4,608 twice per year, for a total annual fee of $9,216.

[4] Golodner's letter to the City of August 5, 2009, stated that STS charged $75 per hour plus parts for any emergency or non-routine services provided. Pl. Exh. 4 at 3.

[5] ISS's annual service fee was slightly higher than ASP's fee, but ISS's equipment cost estimate was far lower. Both ISS's and ASP's annual fees were less than half of STS's annual fee. Although STS did not propose to install and charge for new equipment, the value of new equipment when amortized over the years of a multi-year contract would still have led to the bid of both ISS and ASP being lower than the bid from STS.

6

Berliner agreed, and the City awarded a contract to ISS. Because the annual contract amount was less than $3,000, the City's regulations had not required a formal bidding process. Def. Exh. B at 3. Nor did the regulations require Myers to seek approval from Berliner for his choice of a vendor. Myers testified that he chose to do so because Berliner had initially raised the issue of seeking bidders for and formalizing a contract for the City's alarm services and—as the City's newly appointed Director of Public Works—Myers hoped to impress Berliner that he had conducted a thorough and professional inquiry in response to Berliner's request.

On November 12, 2009, Myers wrote to Golodner to advise that his proposal had not been accepted and that his services for the City would be terminated at the end of the calendar year. Pl. Exh. 4 at 6; Def. Exh. Q. Golodner wrote back to Myers stating "[o]ur position is that you are attempting to cancel[] our work contract based on extreme bias, without any valid reason and due to intentional malice! We believe your intended action violates City Purchasing policies…" Def. Exh. R. Golodner also demanded bid specs from the other proposals, and Myers furnished Goloder with the requested documents. Def. Exh. S.

Plaintiffs filed the instant lawsuit in April 2010. Berliner and Myers filed summary judgment motions on the basis of qualified immunity. Judge Underhill denied these motions, and they appealed. The Second Circuit affirmed Judge Underhill's ruling, concluding in relevant part that Golodner's police lawsuit "constituted speech that raised matters of public concern protected by the First Amendment and that his right to be free of government retaliation based on such speech was well established at the time defendants sought and selected an alternate security system provider." *Golodner v. Berliner*, 770 F.3d 996, 207 (2d Cir. 2014). The Second Circuit further stated that "[w]e take no position on whether Golodner will be able to substantiate his

claim that the City's actions were, in fact, retaliatory," *ibid.*, and the matter was remanded for trial on this issue.

### DISCUSSION

In order to prove their claim of First Amendment retaliation, plaintiffs must show by a preponderance of the evidence that: (1) they engaged in protected speech; (2) that defendants took adverse action against them; and (3) that there was a causal connection between the protected speech and the adverse action. *See Gonzalez v. Hasty*, 802 F.3d 212, 222 (2d Cir. 2015); *Dolan v. Connolly*, 794 F.3d 290, 294 (2d Cir. 2015) (same). "To demonstrate a causal connection a plaintiff must show that the protected speech was a substantial motivating factor in the adverse employment action." *Smith v. County of Suffolk*, 776 F.3d 114, 118 (2d Cir. 2015) (*per curiam*) (internal quotation marks and citation omitted).[6] "A plaintiff may establish causation either directly through a showing of retaliatory animus, or indirectly through a showing that the protected activity was followed closely by the adverse action." *Ibid.*

Here, I conclude on the basis of my review of all the evidence and assessment of the witnesses' credibility that plaintiff has not proven by a preponderance of the evidence that there was any causal connection between Golodner's police lawsuit in August 2008 and defendants' decisions in approximately July 2009 to initiate a bidding process or its ultimate decision not to award the alarm services contract to STS. To begin with, plaintiffs did not offer any evidence of personal animus by Berliner or Myers against Golodner. Plaintiffs, for example, did not

---

[6] Defendants have contended that a more demanding standard of "but for" causation must be proven rather than "motivating factor" causation. Because the Second Circuit has recently reiterated the motivating factor standard in *Smith v. County of Suffolk* and because it would not matter to my resolution of this case which standard I apply, I decline to decide if a "but for" causation standard should apply.

8

introduce any evidence that Berliner or Myers bore any ill will against plaintiffs or that they had made any derogatory comments about them.[7]

Although plaintiffs proved that Berliner learned of Golodner's lawsuit in October 2008, they did not prove that Berliner knew Golodner's affiliation with STS or that he knew that either Golodner or STS were contractors for the City of New London. Plaintiffs did not prove that Myers knew about Golodner's lawsuit against the City prior to the time that he acted on instructions from Berliner to initiate a bidding and contract process. Even Golodner's subsequent letter of August 5, 2009, to Berliner referred only in a general manner to his ongoing conflicts with the City and without reference to any lawsuit that he had filed involving the police.

Plaintiffs principally rely on an inference to be drawn from temporal proximity—the fact that the bidding process was initiated after Golodner had filed his police lawsuit. But it is well established that temporal proximity is not alone enough to support a retaliation claim. *See, e.g., Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 254 (2d Cir. 2014). And here the temporal connection is weak, because it was nearly a year after Golodner's lawsuit that Berliner prompted Myers to initiate a new bidding and contract process.

Nor are there other circumstances that convince me that plaintiffs acted with a retaliatory motive. It is far from unusual or nefarious that a new city manager and finance chief would decide to initiate a bidding and formal contract process for basic city services such as alarm monitoring and servicing. Indeed, as Golodner himself testified, after he started up STS in 2001, the City at that time initiated a bidding process in which he participated on behalf of STS and prevailed in 2002 in securing a formal written contract for STS.

---

[7] Plaintiff did not contend at trial that the City's liability could be premised on the actions or intent of any persons other than co-defendants Berliner and Myers.

9

It is true that Myers conducted the bidding process in a questionable manner. It seems from the dates of the proposals that he received that he likely contacted at least two of the bidders—ISS and ASP—before contacting Golodner and STS. One might expect that a city official in Myers' position would first have contacted the incumbent city vendor about the bidding process before seeking bids from other vendors—especially where, as here, there had been no complaints or concerns about the quality of services rendered by the incumbent provider. On the other hand, I cannot say that it would be altogether irrational for a city official to decide to learn at the outset what other vendors might have to offer before communicating with the incumbent vendor.

When Myers testified about the bidding process, he was fuzzy about the ordering of the steps he took and how he collected the information reflected on his spreadsheet about contractor qualifications. These events happened more than six years ago. It appeared as well from some of the proposal paperwork that another city official from the public works department had met with or been in communication with at least some of the competing vendors, but this other official was not called as a witness at trial by any of the parties, and the extent of his involvement remains a mystery.

All in all, despite the inconclusive nature of some of the evidence about the steps taken during the bidding process, I am not convinced that these loose ends are persuasive evidence that Berliner or Myers harbored an intent to retaliate against plaintiffs for the filing by Golodner of his lawsuit complaining about the City's police department. Both Berliner and Myers credibly testified that they did not act with retaliatory intent. Plaintiffs did not carry their burden at trial to prove that it was more likely than not that defendants acted with intent to retaliate for Golodner's exercise of his rights under the First Amendment.

## CONCLUSION

Although plaintiffs have proven that Golodner engaged in protected speech and that they sustained adverse action as a result of defendants' actions with respect to initiating a bidding process and awarding the alarm services contract to another company, I conclude that plaintiffs have not carried their burden to prove by a preponderance of the evidence that any adverse actions were motivated in whole or in part by any intent to retaliate against protected speech. Accordingly, judgment shall enter for defendants.

It is so ordered.

Dated at New Haven this 25th day of January 2016.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge